# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN POULTER, | ) |
| Plaintiff, | ) |
| | ) No. 12 C 01071 |
| v. | ) |
| | ) Judge John J. Tharp, Jr. |
| COTTRELL, INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Poulter, while working for Cassens Transport Company ("CTC"), was injured when he slipped and fell from the second tier of an auto hauling rig manufactured by defendant Cottrell Inc. He sued Cottrell for strict product liability, negligence, breach of implied warranty, and willful and wanton conduct. He contends that Cottrell is liable for his injuries because his rig did not contain various safety and fall-protection features, including appropriate handholds for him to grab or guardrails to prevent a fall. Cottrell moves for summary judgment on all of Poulter's claims. For the reasons that follow, the motion is denied.

## FACTS

The factual summary is taken from the parties' Local Rule 56.1 statements and responses. Only facts that the Court deems material, undisputed (unless otherwise noted), and supported by admissible evidence, are included. The Court previously addressed Cottrell's motion to strike the testimony of Poulter's expert witness, David Kassekert, partially granting it and restricting the subject matter as to which Kassekert can testify. Order, Dkt. # 96 (June 24, 2014). This opinion relies on Kassekert's testimony only to the extent allowed by that ruling.

Poulter has worked as a car hauler since 1978. Cottrell manufactures car hauling rigs, including the rig from which Poulter fell on January 31, 2011. At the time, Poulter was working for CTC, the owner of the rig. The rig was Cottrell's Model C-10SS, which was first manufactured in 2006. CTC purchased this rig, Unit # 76419, from Cottrell in 2006. An invoice for the purchase is in evidence. The rig in question contained a so-called "Canadian guardrail" (or Canadian "hand rail" or "U-bar"), which, as the name suggests, is a safety feature required by the Canadian government of any rig operating in that country, as of 1994. CTC required Cottrell to include this feature on Unit #76419 and, indeed, on all of the rigs it purchased.

Poulter, who is based in Indiana, was picking up a load in Louisville, Kentucky, when the accident occurred. It was a rainy day. Before he fell, Poulter was loading a pickup truck onto the upper deck of the rig, something he had done "a million times" before with just one previous fall, in 1996. Poulter fell from the upper deck of the rig—specifically, from the "head ramp," which is the part of the rig built around the tractor or cab. Poulter fell from the area above the ladder that is built into the frame of the head ramp. He had loaded the truck and was attempting access the ladder and descend from the rig's upper deck when he slipped. Poulter was wearing non-skid shoes; nevertheless, his left foot slipped, and he does not know why. The Canadian handrail, which is affixed near the front of the headramp, was not within his reach when he fell near the ladder, a few feet away. For stability, Poulter tried to grab onto the pickup truck he had loaded, but the door of that truck flew open. Poulter had nothing else to grab onto. He fell to the ground.

Brian Howes, Vice President of Engineering for Cottrell, was in charge of the design team for the Model C-10SS. The team created the production drawings used to build the rig; those drawings are in evidence and have been sealed because they contain proprietary business information. Howes was responsible for all final design decisions for the Model C-10SS. He

2

testified that the original design did not contain additional fall protection features out of concern that they would make the rigs too wide to comply with (U.S.) federal regulations. He also testified that he "[did] not know" who designed "the Canadian grab bar." Pl. Ex. B at 16:7-8. When asked if "anyone at Cassens [had] and input into the design of the C-10," Mr. Howes answered, "Other than they wanted a strap tie-down rig, I can't recall them having any input." *Id.* at 22:13-16. Howes further testified that Cottrell "did not design the [Canadian] grab bar. It had already been in use." *Id*. at 23:8-11.

Poulter's retained expert, David Kassekert, a mechanical engineer, opined based on his review of photographs of Cottrell rigs, including Poulter's (Unit 76419) and another Cottrell rig (Unit 76407) that featured different fall protection elements, that fall protection features could be added to the rig without affecting its functionality or increasing its width beyond regulated limits. According to Kassekert, a cable guard rail, grab bars, a ladder that vertically extends above the standing surface, and a vertical handrail or grab bar are feasible modifications to Cottrell's design. According to his report, they were made of readily available materials and could be affixed to the rig with welds or bolts.

There is no dispute that Cottrell can and does include certain of these fall-protection features on some of its rigs. In 2008—and therefore, after CTC's purchase of Poulter's rig in 2006—Cottrell began installing grab bars, guard rails, and cat walks on all of its newly manufactured auto hauling rigs, and in 2009, it initiated a retro-fit program to add grab bars, guard rails, and cat walks to all Cottrell auto-hauling rigs sold before that time.[1] The cost of

---

[1] Cottrell does not dispute this fact but objects to the admissibility of the evidence as irrelevant and overly prejudicial. Those objections are overruled. The evidence is relevant to the issue of the feasibility of an alternative design, which is something Cottrell rightly insists Poulter must prove. And it is not overly prejudicial. The evidence is not admitted as an admission of liability or for the purpose of showing a violation of the standard of care (as yet unestablished); indeed,

materials for the retrofit kit—not including labor and installation costs—is between $300 and $400 dollars. In 2005, Cottrell installed grab bars on the head ramps of its "three-car" models; Poulter's was a four-car model that did not contain this feature when purchased or at the time of the accident. Before 2006, Cottrell made portable ladders available for its rigs; these ladders extend above the upper deck and provide a handhold. CTC did not request a portable ladder for the headramp of the rig from which Poulter fell. Elwood Feldman of Cottrell, who sold the rig in question and is now the company's Vice Chairman, testified that in 2006, Cottrell "could have" put "something special" like a grab bar on the rig if the customer wanted it.

Poulter is not the first auto hauler to fall from the upper deck of a Cottrell rig. Since 2003, Cottrell's legal department has maintained a list of claims and potential claims resulting from slip-and-falls on its equipment. There were 81 incidents documented before Poulter's January 2011 injury—and fewer before CTC bought the rig in 2006— but the record does not reflect how many falls were from the upper deck.. In 2005, Cottrell retained an independent safety expert, Dr. Jerry Purswell, to review Cottrell's equipment, including rig Model C-10SS. In his resulting memorandum to Cottrell's general counsel Melanie Stone, Dr. Purswell identified 20 potential hazards, including the hazards of falling from the upper deck when traversing during loading and unloading of vehicles, and falling from ladders. A 1979 survey commissioned by the National Automobile Transporters Associatiaion (NATA), of which Cottrell was and is a member, and the Teamsters Union (of which Poulter is a member) collected data on injuries to workers in the

---

Cottrell does not cite Fed. R. Evid. 407 as the basis of its objection. See Dkt. # 90 at 10 ¶ 24). Cottrell does not identify the nature of the "prejudicial effect," but a limiting instruction to the jury defining the relevance of this evidence would minimize any unfair prejudice that might otherwise result from improper consideration of the retrofit evidence as a subsequent remedial measure.

auto-hauling industry. The survey identified 134 instances where a driver fell from the upper level of a rig to the ground, during a time frame in which 14.3 cars were transported.

Pursuant to a master collective bargaining agreement, in 2004 the Teamsters Union filed a grievance against CTC alleging that "the lack of proper handholds" at certain positions on rigs created an unsafe working condition.[2] That grievance was dismissed without prejudice, and the issue was referred to a joint committee for further study. *See* Def. Ex. H (finding that "no action need be taken at this time," dismissing claim without prejudice, and directing that "the underlying issue of this case be referred to the National Joint Health and Safety Committee for review and consideration"). There is no support in the record for Cottrell's further statement that the arbitration committee dismissed the grievance because there was no "inherently unsafe" condition.[3] The National Master Automobile Transporters Agreement between the Teamsters and auto-hauler employers does not require "handrails and cables" on the upper decks of auto hauling rigs.

Poulter knew that his job was dangerous, and he chose to do it anyway. Poulter also agreed that it was obvious that the rig he was working on at the time of his accident was not equipped with a guardrail, hand-holds, or a ladder extending above the upper deck. Since his accident, Poulter has returned to work and has not fallen again. In July 2012, the condition of the head ramp of his rig changed; it is now equipped with cable guard rails and a grab bar above the ladder.

---

[2] The grievance was against CTC, not Cottrell, and refers to "the Company's [CTC's] trucks"; it is not clear whether CTC purchases rigs from manufacturers other than Cottrell.

[3] Cottrell's affiant, James Osmer, supplies the phrasing that the joint arbitration committee "found that no inherently unsafe condition existed" but the attached decision contains no such language.

## DISCUSSION

The parties agree that the substantive law of Kentucky applies to Poulter's claims, and the Court proceeds on that basis. Under Kentucky law, "[a] party injured by a product can bring suit for that injury under three different theories: (1) breach of warranty under the Uniform Commercial Code, (2) negligence, or (3) strict liability in tort." *Ostendorf v. Clark Equip. Co.*, 122 S.W. 3d 530, 535 (Ky. 2003). Poulter brought his claims under all three theories, but in response to the summary-judgment motion, he withdrew his breach-of-warranty claim. Therefore, the Court does not address it further. What remains are Cottrell's arguments that it is entitled to summary judgment on the strict product liability and negligence claims and its contention that punitive damages are not warranted as a matter of law whether or not it obtains judgment on the plaintiff's claims.

This Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding the motion, the Court must construe the facts and draw all reasonable inferences in favor of the nonmoving party, Poulter. *Ferraro v. Hewlett-Packard Co.*, 721 F.3d 842, 847 (7th Cir. 2013).

### I. Strict Product Liability and Negligence Claims

Because his theory is that the rig was defectively designed, Poulter's strict liability and negligence[4] claims collapse because "the foundation of both theories is that the product is 'unreasonably dangerous.'" *Ostendorf*, 122 S.W. 3d at 535. Typically "negligence examines the conduct of the manufacturer" whereas "strict liability typically evaluates the condition of the

---

[4] Under Kentucky law, there are three theories of negligence with respect to defective products: (1) design defect; (2) manufacturing defect; and (3) failure to warn. *See Clark v. Hauck Mfg.*, 901 S.W.2d 247, 251 (Ky. 1995). Only design defect is at issue in this case.

product"; however, "in a negligent design case, even a strict liability claim examines the manufacturer's conduct." *Id.* (citing *Nichols v. Union Underwear Co. Inc.,* 602 S.W. 2d 429 (Ky. 1980)). "[U]nder either theory, it is the legal duty of a manufacturer to use reasonable care to protect against foreseeable dangers." *Id.* Like the parties, then, for purposes of summary judgment the Court will not distinguish between the strict liability and negligence claims in assessing whether the plaintiff has sufficient evidence from which a jury could conclude that the design of the rig as sold in 2006 was defective.

Cottrell primarily contends that it cannot be held liable for any defect in the design of the rig under the doctrine of *McCabe Powers Body Co. v. Sharp*, 594 S.W. 2d 1980 (Ky. 1980). In that case, the Supreme Court of Kentucky held that a manufacturer cannot be liable for defective design where it manufactured the product in accordance with specifications provided by the buyer, and the alleged defect was an open and obvious feature of the design. *Id.* at 594. Cottrell argues that because CTC, the buyer, ordered a rig with the Canadian-style U-bar, it effectively designed the fall protection system on the rig, and further that the defect—the absence of handholds and an extended ladder—was open and obvious. Poulter does not contest the obviousness of the alleged defects but argues that there is a genuine issue of material fact as to whether CTS can be said to have "designed" the rig in question.

This is not a close question. Cottrell has not established that CTC designed the rig's fall protection systems, and it extends the *Sharp* case beyond all logic in attempting to apply it to this case. Here, the record shows that the extent of CTC's involvement in the "design" of Unit 76419 was its selection of a widely pre-existing, frequently installed safety option on the rig. Certainly, there is a factual dispute as to whether the U-bar itself was built according to a design that CTC submitted to Cottrell at some point in time, but that dispute is not material to the question of

7

whether Cottrell is responsible for the overall design of the head ramp's safety features.[5] Even if that dispute were resolved in Cottrell's favor (of course, it cannot be), *Sharp* would not apply. Even if CTC designed the optional U-shaped bar, there is no evidence it had any input whatsoever into the design elements of the head ramp or any other safety feature of the rig. And certainly there is no evidence that it specified that the head ramp should *not* feature an extended ladder, a guard rail, or a grab bar, or that any of those features would be precluded by inclusion of the Canadian handrail.

On the other hand, the record contains evidence tending to show that Cottrell alone was responsible for the design of the headramp and its components. Not only are the rig's design schematics Cottrell's proprietary, confidential information, Cottrell's engineer testified that his

---

[5] To the extent that this dispute has any relevance to the overall responsibility for the design of the rig's safety features, Poulter has the better of this argument at the summary judgment stage. Cottrell says CTC designed the U-Bar, but the evidence does not specifically bear that out with regard to the rig in question. Cottrell submits a CTC letter to Cottrell dated November 29, 1995, authorizing "the installation of the fall restraint devices on all of our new units, in order to comply with the 'Human Resources Development Canada Labor Programs' ruling" and instructing that the devices "must meet the prescribed regulation and specifications from the information previously forwarded to you." See Def. Exh. E. Cottrell cites no testimony or other evidence to link this 1995 letter to the Model 10SS rig CTC purchased in 2006; and, in any case, the letter does not establish that CTC designed the Canadian handrail. It "forwarded" unspecified information to Cottrell that could have come from any source (such as the Canadian regulation itself). Cottrell also cites evidence that CTC ordered 750 "guardrails for Canadian compliance" in 1995 "to be built per you [sic] spec."; again, there is nothing linking this 1995 purchase to Poutler's rig, which was purchased more than a decade later. *See* Def. Ex. E. And the "spec" referenced in the purchase order could refer to same "forwarded" information referenced in the cover letter. *See id*. Finally, although Cottrell says that the invoice for the 2006 purchase "specified the 'Canadian Style Handrails' on the head ramp of the rig," *see* Def. SOF ¶ 13, Dkt. # 73, the supporting exhibit, a copy of the invoice, does not contain such language. *See* Def. Ex. C. (Nevertheless, Poulter has never disputed that CTC in fact required the Canadian U-bars.)

Furthermore, record evidence further shows that detailed design requirements for the Canadian U-Bar are set forth right in the Canadian Labour Code of March 1994 (when the requirement was instated). *See* Def. Exh. G. Even if it was CTC that "forwarded" those specifications to Cassens, that does not make it responsible for the design of the U-bar, let alone for the design of any other part of the headramp.

8

team designed the Model 10SS rig and that he was responsible for the design of the rig.[6] When asked in written discovery to list every reason fall protection features were not included in the original Model 10SS design, Cottrell did not respond that the fall protection was CTC's responsibility or that CTC had designed the head ramp or any safety element (or lack thereof). *See* Pl. Exh. U. at 6-7.

These facts differ significantly from those addressed by the Kentucky Supreme Court in *Sharp*, There, the buyer provided the detailed specifications for the manufacturer of a cherry-picker, and, when putting the project out for public bidding, explicitly stated that no deviations from that design would be permitted. 594 S.W. 2d at 593. And the accident occurred when the plaintiff fell from the open side of the cherry picker: a design feature explicitly required by the buyer. *Id*. Here, there is nothing more than an order for a rig that included a Canadian-style grip bar. Again, there is no evidence that that option is incompatible with any of the other fall protection features that Poulter claims were required to make the rig reasonably safe, or that CTC eschewed safety features that otherwise would have been part of the rigs. Because there is no evidence that the Model C-10SS rig that CTC purchased in 2006, and which became Poulter's, was designed without a grab bar, guard rail, or extended ladder because of design decisions made by CTC rather than Cottrell, the Court cannot grant summary judgment for the manufacturer under Kentucky's *Sharp* doctrine.

Cottrell further contends that, even if *Sharp* does not apply, it is entitled to summary judgment because Poulter cannot establish that its product was unreasonably dangerous as

---

[6] In its briefing Cottrell now contends that this statement was merely meant to reflect Kentucky law to the extent that it can be liable even for buyer-designed defects if they are not open and obvious. This dubious explanation (of an admission made long before it was determined what law would apply in this case) is one possible view of the evidence, but a jury could also infer from it that Cottrell exclusively designed the rig, including whatever safety features were installed or not installed on the head ramp before any customization.

designed and as sold to CTC in 2006.[7] First, Cottrell contends that the opinions of Poulter's retained expert, David Kassekert, are inadmissible and that Poulter cannot prove his claims without expert testimony regarding risk utility. Cottrell, however, has not established that expert testimony is *per se* required to prove a design defect under Kentucky law. In any case, the premise of the argument is unsound now that the Court has ruled that some of Kassekert's testimony is admissible. In particular, Kassekert will be permitted to testify regarding the feasibility of incorporating into the design of the rig particular fall-protection features on the head ramp from which Poulter fell.[8]

Cottrell also argues specifically that the plaintiff has no evidence, expert opinion or otherwise, to satisfy the risk-utility test that applies in defective design cases. Although Cottrell cites only Illinois law in its opening brief, it is clear that Kentucky courts also apply risk-utility analysis in design-defect cases. *See Ostendorf*, 122 S.W.3d at 535 ("In a design defect case, courts use some form of risk-utility analysis to assess the decisions made by manufacturers with respect to the design of their products."). That requires comparison of the utility of the existing product's design features against the risks that they present. *See id. See also* Restatement (Third) of Torts: Product Liability § 2 cmt. n.(a) (In defective-design cases, "some sort of independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary. Products are not generically defective merely because they are dangerous. Many product-related accident costs can be eliminated only by excessively sacrificing product features that make products useful and desirable. Thus, the various trade-offs need to be considered in determining whether accident costs are more fairly and efficiently borne

---

[7] Inexplicably, Cottrell makes these arguments with reference to Illinois law alone, until its reply brief. See Mem., Dkt. # 73 at 17-20.

[8] Under Kentucky law, liability for a design defect requires proof of an alternative feasible design. *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004).

10

by accident victims, on the one hand, or, on the other hand, by consumers generally through the mechanism of higher product prices attributable to liability costs imposed by courts on product sellers."). Where the risk-utility test is used, there is an implicit requirement of showing that a reasonable alternative design was available. *See Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004).

Cottrell's argument that the plaintiff lacks any evidence with which to establish a negative risk utility of Cottrell's design or a feasible alternative design is belied by the record. As to risk utility, there is sufficient evidence from which a jury could conclude that including the proposed fall-protection features in the original design would not have sacrificed product features that make the rig useful and desirable. Kassekert's permitted testimony addresses this issue; moreover, Cottrell's own engineer, who designed the rig in question, has relevant testimony on this subject, although his opinion conflicts with Kassekert regarding the effect of safety features on the width of the rig. With regard to a feasible alternative design, again, Kassekert is permitted to opine that that the safety features could have been included in the original design. Cottrell's own witnesses peg the relatively low cost of the materials needed to retrofit the rigs with the fall-protection features. Finally, the adjustments of Cottrell's designs after 2008 to include additional fall protection, while not admissible to show Cottrell's liability, are relevant to the issue of the feasibility of the alternative designs for which Poulter advocates.

Finally, Cottrell briefly contends (again with reference to Illinois law) that the plaintiff's claims must fail because he lacks evidence of causation, and "a causative defect cannot be inferred based on the fact of a fall alone." Mem., Dkt. # 73 at 19. Cottrell has not supported this argument sufficiently to show that it is entitled to judgment as a matter of Kentucky law.

Under Kentucky law, the plaintiff in a products liability action has the burden of establishing causation under the "substantial factor" test. *See King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir. 2000). Under this test, the plaintiff "must prove that the defendant's conduct was a substantial factor in bringing about plaintiff's harm. Plaintiff may use circumstantial evidence, and in that situation, the evidence must be sufficient to tilt the balance from possibility to probability." *Id.* (quotation marks and citations omitted). In this case, the photographs of the rig and Poulter's description of his fall, particularly his inability to grab onto anything or brace himself from falling, are sufficient evidence from which a jury could infer that the absence of a guard rail, extended ladder, or grab bar was a substantial factor in bringing about Poulter's injuries. Cottrell has succeeded in having the plaintiff's proffered expert testimony on this point barred, but this is not an issue as to which expert testimony is required. Indeed, it is difficult to understand how an expert could competently testify as to the cause of Mr. Poulter's injuries; the Court barred Kassekert from offering just such an opinion because there is no plausible foundation for it, even leaving aside the question of what "scientific, technical, or other specialized knowledge" could be brought to bear on identifying what caused Poulter's accident under the facts of this case. In a case such as this one, causation is more likely to be established through circumstantial evidence and the fact-finder's reasonable inferences based upon that evidence.

## II.     Punitive Damages

Cottrell also seeks judgment on Poulter's theory of "willful and wanton conduct," which the parties seem to agree is not a separate claim for relief, but rather the theory behind plaintiff's request for punitive damages. Cottrell contends that, as a matter of law, the evidence cannot sustain punitive damages in this case.

12

Under Kentucky law, punitive damages may be awarded for "gross negligence." In fact, the Kentucky Supreme Court struck down a statute that required a greater showing. *Williams v. Wilson*, 972 S.W.2d 260, 264 (Ky. 1998) (explaining that because at common law "unintentional conduct amounting to gross negligence . . . was sufficient to authorize recovery of punitive damages," the legislature could not impose a higher standard). In the product liability context, Kentucky courts have required that the plaintiff prove, "in addition to an injury-causing product defect, that something about the defendant's conduct was outrageous, was at least grossly negligent, and amounted to reckless indifference." *Sufix, U.S.A., Inc. v. Cook*, 128 S.W.3d 838, 841 (Ky. Ct. App. 2004) (upholding award of punitive damages where jury found manufacturer grossly negligent in failing to conduct rudimentary tests that would have revealed danger that caused injury). In the context of punitive damages, "gross negligence" means "wanton or reckless disregard for the safety of other persons" and, rather than express malice, "conduct . . . so outrageous that malice could be implied from the facts of the situation." *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003) (reaffirming standard from *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382 (Ky. 1985)); *Horton*, 690 S.W. 2d at 389-90 ("[N]egligence when gross has the same character of outrage justifying punitive damages as does willful and malicious misconduct in torts where the injury is intentionally inflicted . . . In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'").

Here, Cottrell argues that punitive damages cannot be awarded as a matter of law because: (1) there is no statistical evidence regarding falls from its rigs and no evidence that it was recklessly indifferent to the "few falls" it knew of; (2) Cottrell cannot be found to have acted

"outrageously" when it designed a product according to CTC's specifications; and (3) there is no evidence of motive. Mem., Dkt. # 91 at 14-15. The Court has already rejected the theory underlying the second reason, and Cottrell provides no authority for its third argument, that evidence of evil motive is required to obtain punitive damages.[9] Indeed, its argument conflicts with Kentucky law, which permits punitive damages to be awarded for grossly negligent conduct irrespective of motive or intent. As for the first argument, again Cottrell cites no authority that requires the plaintiff to submit statistical evidence in support of a punitive damages claim.

There is at least some record evidence of reckless indifference, supporting punitive damages; although that evidence is not substantial, at this stage the plaintiff need only show that there is some dispute of fact as to whether Cottrell's failure to include the pertinent fall protection features was grossly negligent and in reckless disregard for the safety of others. The plaintiff submits evidence that Cottrell was aware of the risks presented to drivers working on the second tier of auto hauling rigs. He cites, among other evidence, the 1979 NATA survey, the Purswell memorandum, and Cottrell's own internal list documenting "claims and potential claims" from slip-and-fall accidents associated with its rigs.[10] Poulter also points to the testimony of Cottrell's retained expert in another lawsuit that occurred when a plaintiff fell from a Cottrell rig in 2003, to the effect that drivers were "at risk of injury while maneuvering on the

---

[9] To be sure, Kentucky follows the multi-factor approach set forth by the Supreme Court to determine whether, for purposes of conformity with the Due Process Clause, the conduct supporting punitive damages is suitably "reprehensible." Among those factors is whether the "harm resulted from intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409, (2003); *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 566-67 (1996). *Nissan Motor Co. v. Maddox*, ---S.W. 3d ----, 2013 WL 4620488, at *10 (Ky. Ct. App. Aug. 30, 2013). As the Supreme Court explained, these are factors, not requirements: "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *State Farm*, 538 U.S. at 419.

[10] As Cottrell rightfully points out, however, plaintiff has not shown that the 81 claims stem from accidents that are comparable to Poulter's.

top deck or climbing ladders." Inaction in the face of a known danger, to the extent it is remediable, could permit an inference of reckless disregard for safety. *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255, 268 (Ky. Ct. App. 2008) ("Where the potential for harm is great and directly evident, Kentucky has found that a reckless disregard for the rights of others may be inferred from the negligent act."); *see Sufix*, 128 S.W.3d at 842 ("[w]hile its conduct may not have been as reprehensible as some deliberate wrongdoing, its cavalier willingness to expose the public to an unreasonable risk of severe physical injury was egregious enough to merit a significant penalty") (referring to lack of testing).

Poulter also suggests that Cottrell deliberately isolated its engineering arm from knowledge of injuries and accidents occurring on Cottrell rigs—records of which were exclusively maintained in the legal department. Poulter cites the testimony of Cottrell's own witnesses, Melanie Stone and Brian Howes to show a "deliberate corporate policy of Cottrell to insulate its engineering department from acquiring any information of the circumstances of the falls giving rise to the lawsuits filed against Cottrell which could have been used to improve safety." Howes—a company executive and the engineer who designs Cottrell's rigs—testified, remarkably, that he was not aware of *any* falls from a Cottrell rig until 2008. If, as Poulter contends, Cottrell kept its engineers in the dark as part of a business strategy, a jury could reasonably infer indifference to the safety of the users of Cottrell's products. Unreasonably failing to obtain or share critical information that is readily available can support punitive damages under Kentucky law, such as where a manufacturer does not conduct sufficient testing or where a miner fails to take adequate steps to locate private property lines. *See Nissan*, 2013 WL 4620488, at *10; *Crutcher v. Harrod Concrete and Stone Co.*, --- S.W.3d ----, 2013 WL

1163945, at *9 (Ky. Ct. App. Mar. 22, 2013). The plaintiff's evidentiary burden at trial is high, but at this stage Cottrell has not shown that punitive damages are impossible as a matter of law.

\* \* \*

For the reasons set forth above, the motion for summary judgment is denied.

Date: June 24, 2014

John J. Tharp, Jr.
United States District Judge