# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN POULTER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 12-CV-1071 |
| COTTRELL, INC., | ) ) Judge John J. Tharp, Jr. |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Poulter has moved for a new trial pursuant to Fed. R. Civ. P. 59. He contends that four evidentiary decisions, individually and collectively, so biased his trial that it was incompatible with substantial justice. The rulings were not erroneous and did not, individually or in the aggregate, substantially influence his trial. Therefore, the motion for a new trial is denied. This opinion also addresses Poulter's objections to Cottrell's bill of costs.

## BACKGROUND

Plaintiff John Poulter was working as a car hauler when he fell off the upper deck of a rig designed by defendant Cottrell, Inc. ("Cottrell"). Poulter argued the rig was defectively designed. The case went to trial in February 2017. After a five day jury trial, the jury found Cottrell not liable. Poulter timely moved for a new trial.

During pretrial motions, the Court excluded a significant number of Poulter's proposed expert's opinions because the expert (David Kassekert) failed to provide a sufficient basis for his opinions or because the opinions would not be helpful to the trier of fact. *See Poulter v. Cottrell, Inc.*, No. 12 C 01071, 2014 WL 5293595, at *5 (N.D. Ill. June 24, 2014) ("*Daubert* Order"). The Court allowed, however, testimony regarding "the feasibility of including fall protection features in the design of the rig and the effect of such modifications on maximum width requirements"

with a note that "his testimony may not exceed the scope already disclosed." *Id.* Also before trial, the Court also denied several of Poulter's motions in limine, which are discussed in more detail below.

At trial, Poulter introduced evidence, including the testimony of several Cottrell employees, for the purpose of showing that the company was aware of the potential risk of employees falling off of rigs while working on the upper deck. He also introduced substantial medical evidence of his injuries from doctors and family members. Poulter himself testified about what happened on the day of the fall. Cottrell argued that the rig was not defectively designed and that the fall had been caused by ice on the rig, Poulter's worn out shoes, Poulter's failure to follow safety rules, or some combination of those factors. Cottrell introduced medical testimony and expert testimony regarding safety engineering and weather, as well as testimony from Poulter's supervisor. The parties stipulated that Poulter's proposed alternative design, which incorporated several fall protection measures, was legally, financially, and technically feasible.

## DISCUSSION

A new trial is appropriate if "the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). Poulter does not contend that the jury's verdict was against the weight of the evidence, but rather that four evidentiary decisions rendered the trial unfair. Even if a court's evidentiary ruling was erroneous, that is grounds for a new trial (individually or collectively) only if "in light of the entire record," there is "a significant chance that the error affected the jury's verdict." *Barber v. City of Chicago*, 725 F.3d 702, 715 (7th Cir. 2013). The

Court must also consider the "efficacy of any remedial measures" and the strength of the defendant's case. *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012).

Here, Poulter claims four of the Court's evidentiary decisions were erroneous. First, he argues expert David Kassekert's testimony was limited at trial beyond the Court's initial *Daubert* Order. Next, he argues the Court erroneously allowed testimony regarding the collective bargaining agreement ("CBA") between the Teamsters' Union and Poulter's employer (Cassens). Third, Poulter contends that the Court should not have allowed testimony that Cassens did not ask Cottrell to install (at the time of manufacture or at the time a retrofit kit was made available) various fall protection devices. Finally, he argues that the Court should have allowed questioning of Cottrell's general counsel regarding a report that acknowledged a risk of falling from the upper deck. None of these contentions is meritorious.[1]

**I. Kassekert's Testimony**

In the 2014 *Daubert* Order, the Court limited Poulter's expert to testifying "about the feasibility of including fall protection features in the design of the rig and the effect of such modifications on maximum width requirements." *Daubert* Order, 2014 WL 5293595 at *5. Poulter does not appear to challenge the merits of that limitation; rather, he objects that Kassekert's testimony was restricted further at trial. Just before trial, the parties agreed to a stipulation that the fall protection features about which Kassekert was going to testify were technically, economically, and legally feasible. *See* Tr. 261:15-262:17, Feb. 14, 2017. This stipulation rendered both opinions Kassekert was allowed to give superfluous, as they had already been stipulated to and thus rendered "within the average juror's comprehension." *See*

---

[1] Tellingly, the bulk of Poulter's argument in the motion does not relate to any of the significant and closely contested factual disputes that were the focal point of the parties' evidentiary presentations at trial, such as causation (both of Poulter's fall and whether certain injuries were a result of the fall), reasonableness of the design, and damages.

*Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998). In discussion with the Court, Poulter's attorney appeared to acknowledge that given the scope of the stipulation and the *Daubert* ruling, the only use of Kassekert's testimony would be to describe the safety features discussed in the stipulation. *See* Tr. 111:3-113:16, Feb. 14, 2017. Kassekert did so, drawing each safety feature on photographs and explaining how it could be implemented. This was in no way a reversal of the Court's earlier opinion, which explicitly barred evidence of causation and only allowed useful information about feasibility. *Daubert* Order, 2014 WL 5293595 at *5. The entire point of the section of the *Daubert* Order on which Poulter relies was that Kassekert's testimony regarding the potential safety features could illustrate the safety features and therefore their relationship to the alleged defect. Poulter's claim that "Kassekert was not permitted to testify regarding his analysis of photographs of the relevant equipment or to explain why, in his opinion, the proffered safety features were feasible," Mot. at 4, ECF No. 242, is simply wrong. Kassekert was allowed both to illustrate and explain those safety features to the jury. See Tr. 112:20-113:13, Feb. 14, 2017 ("if you want to call Mr. Kassekert to . . . illustrate that on a photograph or whatever . . . you can do that much"); *id.* at 269:20-75:6 (Kassekert drawing illustrating on photographs the precise locations where feasible safety features could have been added). To the extent that Poulter maintains that Kassekert should have been permitted to opine that the design was defective without the missing safety features, the *Daubert* Order (at *5) explained that Kassekert had failed to provide an adequate basis to opine that the design of the rig was defective without the addition of those safety features and the limitations imposed on Kassekert's testimony at trial were consistent with that ruling; certainly the Court did not "reverse itself" in that regard.[2] Based on pretrial rulings adverse to the defendant, Cottrell agreed

---

[2] *See* Tr. 113:1-13, Feb. 14, 2017. ("given my prior ruling, his opinions about design

4

to a stipulation as to the feasibility of adding all of the safety features that Kassekert identified as feasible in his report. Given that stipulation, Poulter got every ounce of mileage from Kassekert's testimony that he could have; further testimony regarding the feasibility and legality of the safety features would have been superfluous and would not have swayed the jury.[3]

Poulter also appears to contest that Kassekert's background was erroneously limited despite the brief scope of his anticipated testimony. Poulter alleges this lack of extensive background left the jury with a "gap in understanding why [Kassekert] was testifying about the three safety features at all." Mot. at 5 ECF No. 242. Kassekert, however, provided plenty of detail about his education and work experience, including his experience designing ladders. *See* Tr. 263:14-267:14, Feb. 14, 2017. The testimony provided ample background for the jury to understand why he would be qualified to describe the fall protection features. Further background information would likely be cumulative, and certainly would not have presented a significant chance of swaying the jury's verdict.

**II. CBA and Retrofit Kit**

Under Kentucky law (the applicable law in this case), a manufacturer has a "non-delegable duty to provide a product reasonably safe for its foreseeable uses." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 782 (Ky. 1984). A defendant may, however,

---

defect . . . all that is out of play"). Moreover, at no point during the trial did Poulter object that the limitations being imposed on Kassekert were inconsistent with the Court's prior ruling. And whether inconsistent or not, Poulter identifies no substantive flaw in the Court's ruling at trial. He offers no explanation for why Kassekert should have been permitted to opine about design defects. Nor does he identify what he would have asked Kassekert that would have been permitted by the prior opinion but was not permitted at trial (and, because he offered no objection that the Court's trial ruling was inconsistent with the *Daubert* Order, he made no offer of proof at trial either).

[3] The jury was instructed on the weight to be given to a stipulation, *see* Tr. 1063:20-1064:1, Feb. 17, 2017, and the stipulation was heavily argued by Poulter's counsel in closing, *see id.* at 1077:6-1078:9.

present evidence of industry practice to demonstrate whether or not the product was in fact reasonably safe. *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 40 (Ky. 2004). This is sensible, as defectiveness means that "the product does not meet the reasonable expectations of the ordinary consumer as to its safety." *Greene v. B.F. Goodrich Avionics Sys.*, 409 F.3d 784, 789 (6th Cir. 2005).

Poulter argues, however, that the Court erred when it allowed Cottrell to introduce evidence of the Teamsters' Union collective bargaining agreement ("CBA") and the specifications Cassens provided when it ordered the custom-built rig at issue from Cottrell. He also objects to the inclusion of testimony that Cassens did not immediately add the safety features at issue when a retrofit kit was made available by Cottrell in 2009. Poulter objects that Cottrell did not prove that these sources were "reliable gauge[s] of industry knowledge." Mot. at 7. Poulter further argues, without any supporting case law, that only the expectations of car haulers who use the rigs, rather than the organizations that negotiate their specifications and order them, are relevant. *Id.* at 8-9. Finally, Poulter argues this testimony created a "potential danger" of confusing the jury and distracting from Cottrell's duty to design a safe product.

Poulter concedes that the Court gave a proper jury instruction regarding a manufacturer's non-delegable duty under Kentucky law. *See* Tr. 1071:4-9, Feb. 17, 2017. Poulter's counsel also explicitly argued in rebuttal that the non-delegable duty meant that the jury could not shift responsibility onto Cassens or anyone else for any defect. *See id.* at 1130:19-1132:7. More importantly, the defense never argued that anyone other than Cottrell had a duty regarding the design. Rather, Cottrell explicitly (and briefly) presented the CBA as evidence of industry standards and emphasized the lack of evidence that other manufacturers were installing similar

6

safety features during the relevant time period. *See id*. at 114:1-11, 1115:14-1117:12, 1122:14-1123:6.

Industry standards are a proper factor in determining whether or not a product is unreasonably dangerous. *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980). Here, Cottrell introduced brief testimony regarding the requirements of the Teamsters Union and the practices of a major industry purchaser to demonstrate industry standards during the relevant time period. The defendant did not need to prove how well this testimony demonstrated industry standards – that is an issue that goes to the proper weight given to the testimony that Poulter could have chosen to argue.[4] Furthermore, as Cottrell properly pointed out in closing, the Teamsters Union is comprised of car haulers like Poulter, so it can be fairly seen to represent their expectations. To the extent that Poulter maintains that Cassens' decision not to request additional safety features is not relevant because Cassens cannot be considered a consumer or industry participant whose expectations might be relevant in determining the reasonableness of the design, the argument is supported by neither logic nor authority. Cassens, not Poulter, was Cottrell's customer, and as an employer potentially liable for injuries to employees on the job, Cassens had a substantial interest in providing adequate safety features on its rigs; consideration of its expectations with regard to safety design therefore fits comfortably within the category of

---

[4] Oddly, Poulter appears to object to the **brevity** of the testimony he alleges was erroneously admitted, claiming that Cottrell failed to present evidence of its reliability as a gauge of industry standards, failed to present evidence of follow up studies, and asked "only one question on this issue" of a key witness. Mot. at 6-8. This allegedly "flimsy foundation," *id.* at 8, cuts the other way – it demonstrates the evidence that was admitted was unlikely to sway the jury. Poulter's argument amounts to nothing more than a contention that the jury weighed the evidence incorrectly, but that is not sufficient to merit a new trial. *See Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2013 WL 4506004, at *5 (N.D. Ill. Aug. 23, 2013) ("mere[] hopes that the Court will re-weigh the evidence to reach a conclusion contrary" insufficient for a new trial).

7

relevant evidence of industry expectations. The testimony was, moreover, brief and it was followed by the jury instruction on non-delegable duty, so there is no basis to believe that the jury gave undue emphasis to this testimony or used it improperly.

As to the evidence regarding the retrofit kit, Poulter initially argues that the Court improperly denied his request to bar evidence of when Cassens installed the retrofit kit. *See* Mot. at 2. This argument is disingenuous at best. Poulter himself initially moved in limine to ***admit*** the evidence that Cottrell offered the retrofit kit, although he also moved to bar evidence that Cassens did not immediately install the retrofit kit once Cottrell made it available. *See* Pl.'s Mot. in Limine 19-20, ECF No. 188, 189. These rulings were clearly intertwined, with Cottrell's counsel arguing that the retrofit kit was a subsequent remedial measure barred under Fed. R. Evid. 407 but that the timing of the retrofit kit would be a useful counterbalance to the fact that they offered the kit (which on its own would seem to indicate an acknowledged safety problem) if their objection were overruled. Poulter argued that he needed the evidence of the kit to demonstrate legal feasibility of the alternative design. After the initial pretrial conference, however, the parties worked out a stipulation on legal feasibility that they agreed obviated the need for evidence about the retrofit kit. Thus, the Court denied the motion to bar timing evidence because the parties appeared to agree that no evidence about the retrofit kit would be introduced.[5]

During trial, however, defendant's own expert (George Widas) opened the door to evidence about the retrofit kit when he indicated he disagreed with Cottrell regarding legal feasibility while being cross-examined by Poulter's attorney. *See* Tr. 961:2-962:20, Feb. 21,

---

[5] The apparent tension between the need to demonstrate a feasible alternative design under Kentucky law and Rule 407 has drawn commentary. *See* Laura B. Grubbs, Note, *Something's Gotta Give: The Conflict Between Evidence Rule 407 and the Feasible Alternative Design Requirement*, 45 BRANDEIS L. J. 781, 807 (2007). Stipulations are frequently employed as a means to address the plaintiff's need to show feasibility and the defendant's concern about the prejudicial inferences that evidence of subsequent remedial measures might engender. *Id.*

2017. On redirect, Cottrell (rescinding its prior objection) then opted to reveal the retrofit kit evidence that Poulter had attempted to admit earlier. *See id.* at 1013:14-1016:3. Cottrell then asked Widas when Cassens had installed the retrofit kit, without objection from Poulter's counsel except for one question ("Do you know why Cassens didn't put it on the rig at the time of the accident?") to which Widas responded "no idea." *Id*. at 1016:21-1017:3. The Court overruled Poulter's objection to that question on the basis of Widas's non-answer, and Poulter did not object to any of the remaining testimony regarding Cassens' decision to install the retrofit kit. Thus, Poulter failed to properly preserve his objection to this testimony when circumstances changed and the Court's ruling was no longer definitive. *See Wipf v. Kowalski,* 519 F.3d 380, 385 (7th Cir. 2008); *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1200 (7th Cir. 1992); *Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999). Furthermore, the testimony regarding the timing of the retrofit kit was a proper demonstration of industry standards regarding the desired safety features. When presented with the ability to add the features, Cassens delayed, implying that the features were not viewed as desirable or necessary by at least one industry participant.

Finally, Poulter argues in his reply that Cottrell attempted to "shift blame" to Cassens during closing argument when it explained that the retrofit kit had been made available to its customers beginning in 2009. Pl.'s Reply at 2-3, ECF No. 249. That argument is remarkable, given that it was Poulter's counsel, at the very outset of his opening argument as he addressed the issue of feasibility, who reminded the jury that Cottrell had made the retrofit kit available in 2009 but Cassens had not installed it until 2012: "We heard that they were now on Mr. Poulter's truck since July of 2012, and we heard from defendant, from Cottrell, that those items, they were putting them out as a retrofit kit to add on to trucks starting in 2009." Tr. 1077:1-5, Feb. 17, 2017. Cottrell's attorney responded to the feasibility argument ("just because you did this doesn't

9

mean that the prior design was defective or caused his fall"; Tr. 1118:12-13, Feb. 17, 2017), but the statements about which Poulter complains are brief and ambiguous.[6] Counsel simply stated that the kit had been made available, that it was not put on until after the accident, and that there was "no evidence" of why. Tr. 1126:11-16, Feb. 17, 2017. That was the end of any comment by Cottrell on the retrofit kit; no argument was made about the significance of the fact that Cassens had not installed the retrofit kit at the time of Poulter's fall. Despite being finely attuned to the competing nuances of this evidence, Poulter's counsel did not object to this testimony at the time and himself referred to the availability of the retrofit kit in closing. *See id.* at 1077:1-5. *See also Deppe v. Tripp,* 863 F.2d 1356, 1363 (7th Cir. 1988). Clearly Poulter did not at the time perceive this remark to be attempting to shift Cottrell's non-delegable duty to Cassens, or he would have objected as he did elsewhere during Cottrell's closing. *See* Tr. 1117:1, Feb. 17, 2017. Cottrell's passing remark, to the extent it might have been understood as an attempt to shift blame, was harmless in light of the variety of evidence, instructions, and argument regarding Cottrell's non-delegable duty.

In short, the testimony about the CBA and the retrofit kit was properly admitted for the purpose of showing industry standards and did not create any substantial risk of undue prejudice.

**III. Purswell Memorandum**

Finally, Poulter objects that he was not allowed to question Melanie Stone, Cottrell's in-house counsel, regarding a brief memorandum by Dr. Purswell (a safety expert Cottrell had retained several years before the accident) that twice identified falling from upper decks (once in

---

[6] Quoting in full (Tr. 1126:11-16, Feb. 17, 2017):

"If I didn't make it clear, this—this retrofit kit was first made available in 2009. Okay. I don't know if I mentioned that. And Cassens didn't put it on here until 2012, okay, after his 2011 accident. So why didn't Cassens put it on? There is no evidence of that. But it wasn't put on, and there is evidence that it was offered.

10

the context of climbing ladders and once in the context of loading and unloading vehicles) as a hazard facing drivers using Cottrell's rigs. *See* Pl.'s Ex. 9, ECF No. 242-9.

As an initial matter, it is not clear whether Poulter objects to his inability to question Stone about the memorandum or to the fact that the memorandum was barred from being admitted due to a ruling in limine. *See* Mot. at 11. Regardless, the probative value of the information in the Purswell memorandum was minimal. It merely listed falling as two among twenty hazards in a numbered list that might warrant the provision of warning labels on Cottrell's rigs. The memo provides no information as to how Purswell identified the hazards, the relative (or absolute) severity of the hazards, whether the hazards were relevant to Poulter's rig, or that the design of whatever rig it discusses was not adequate from a safety perspective. The report did, on the other hand, present a substantial risk of juror confusion, as jurors could easily have conflated the issues of a need for a warning with the question of inadequate design. Furthermore, Poulter presented ample of evidence to establish the common sense proposition that falling from the top of rigs was a known hazard, further rendering this evidence cumulative.[7] Whether excluded under Rule 402 as irrelevant or Rule 403 as minimally relevant but unduly prejudicial, the information in the report was properly excluded.

Accordingly, the motion for a new trial is denied.

---

[7] For example, Poulter introduced the uncontradicted testimony of Cottrell's vice president of engineering that he was "aware that there is a risk of falling" when a car hauler has exited a vehicle. *See* Tr. 671:14-16, Feb. 16, 2017. Poulter also was able to question Ms. Stone specifically about two prior incidents in which car haulers fell off of the upper decks of Cottrell rigs. *See* Tr. 70:1-79:16, Feb. 13, 2017. George Widas, Cottrell's own expert, acknowledged "the fact that you could fall" from a rig and that death could result. *See* Tr. 958:1-4, Feb. 17, 2017. In closing argument, Cottrell's own counsel even seemed to concede that falling was an obvious risk, stating "[t]he point was never that you can't fall" because the rigs clearly have "open sides." *See id*. at 1113:20-25.

**IV. Bill of Costs**

As the prevailing party, Cottrell is entitled to costs. *See* Fed. R. Civ. P. 54(d)(1). Poulter raises three objections to Cottrell's bill of costs. First, he objects that Cottrell ordered daily transcripts (at the Court-approved rate for such transcripts) rather than less-expensive transcripts requiring more time. Second, Poulter objects to any costs regarding video recordings of depositions. Finally, Poulter objects to the $1,600 deposition fee for Dr. Zelby.

The largest claimed expense by far is the daily transcript cost. Transcripts are an acceptable cost as long as "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). Once a cost is recoverable, the Court must determine whether the amount assessed is reasonable. *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000). Generally, daily transcripts are more likely to be considered reasonable in a longer, more complex trial. *See Lewis v. City of Chicago,* No. 04 C 6050, 2012 WL 6720411, at *7 (N.D. Ill. Dec. 21, 2012). Other factors to be considered include "(1) whether a daily transcript was necessary to minimize disagreement over the testimony of witnesses, (2) whether proposed findings of fact were required, (3) whether the case involved expert witnesses whose cross-exanimation required knowledge of the exact wording of their previous testimony or that of any other witness, (4) the size of the claim, and (5) the importance of witness credibility." *Id*. (internal quotation marks omitted). Intention to file a Rule 50 motion has generally been seen as a valid reason to order daily transcripts. *See Stollings v. Ryobi Techs., Inc.*, No. 08 C 4006, 2015 WL 4100479, at *7 (N.D. Ill. July 6, 2015); *Simstad v. Scheub*, No. 2:07-CV-407-JVB, 2015 WL 880612, at *4 (N.D. Ind. Mar. 2, 2015).

Here, Cottrell did file a written Rule 50 motion following the close of Poulter's case in chief and attached a transcript. *See* ECF No. 227. Furthermore, witness credibility was a key issue in this case, as one of the most heavily contested issues was whether or not Poulter's

account of his fall was credible. The credibility of the complex and far-ranging testimony of expert George Widas was also a key component of the case. As Cottrell correctly points out, the punitive damages claim in this case was over $5,000,000. Under these circumstances, the Court finds it was reasonable for Cottrell to order daily transcripts in order for it to prepare its Rule 50 motion and its closing argument. Plaintiff's objection to the daily transcript fees is overruled.

Next, Poulter objects to the fees related to the video depositions of himself, Dr. Raskas, Dr. Zelby, and Dr. Garelick. Poulter initially incorrectly asserts that none of these depositions were used at trial, despite the fact that Dr. Raskas and Dr. Garelick's video depositions were played at trial. The Seventh Circuit has held that costs associated with videotaping depositions are properly taxed as costs. *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 702 (7th Cir. 2008). Furthermore, a video deposition need not be introduced as evidence in order to be necessary as a cost. *Treat v. Tom Kelley Buick Pontiac GMC, Inc.,* No. 1:08-CV-0173-WCL-RBC, 2010 WL 3672230, at *2 (N.D. Ind. Sept. 13, 2010) (citing *Hudson v. Nabisco Brands, Inc.*, 758 F.2d 1237, 1243 (7th Cir. 1985)). Here, the testimony of all of these witnesses was introduced at some fashion at trial (either by live testimony, reading, or video) and was key to at least one side's case. In at least three of these, the video component of the deposition was key – both Raskas and Garelick used visuals to illustrate their testimony, and Poulter performed a maneuver similar to his in-court demonstration. Thus, the Court finds the costs associated with the video depositions were reasonably necessary and overrules Poulter's objection.

Finally, Poulter argues that Dr. Zelby's $1,600 deposition fee should be reduced to the standard expert witness attendance fee of $40. *See* 28 U.S.C. § 1821(b) (setting $40 witness fee). 28 U.S.C. § 1920(3) allows for "[f]ees and disbursements for printing and witnesses." Although a party cannot obtain more than the $40 expert witness fee for his own expert under Fed. R. Civ.

P. 54(d), *Chambers v. Ingram*, 858 F.2d 351, 360 (7th Cir. 1988), Rule 26 asserts that "the court must require that the party seeking discovery pay the expert a reasonable fee for time spent responding to discovery." Fed. R. Civ. P. 26(b)(4)(E)(i). The Seventh Circuit has held that if Rule 26 applies, the Court has discretion to award a fee above the witness fee given by statute. *Halasa v. ITT Educ. Servs.*, 690 F.3d 844, 851-52 (7th Cir. 2012).

As noted above, it is the party ***seeking discovery*** who is expected to bear the cost of the expert witness. Cottrell argues that Dr. Zelby was originally retained by Cassens as an expert in Poulter's workman's compensation case and therefore Cottrell is not the party seeking discovery. *See* Def.'s Resp. at 6, ECF No. 251. That is irrelevant, however, because Cottrell deposed Zelby, apparently for this case, on January 26, 2015. Zelby's testimony was then used by Cottrell at trial. Thus, it is Cottrell that was seeking the discovery during that deposition and Cottrell who properly pays the reasonable cost to the expert under Rule 26. *See Halasa v. ITT Educ. Servs., Inc.*, No. 1:10-CV-437-WTL-MJD, 2012 WL 639520, at *2 (S.D. Ind. Feb. 27, 2012), *aff'd*, 690 F.3d 844 (7th Cir. 2012); *Sunderland v. Bethesda Hosp., Inc.*, No. 13-80685-CV, 2016 WL 7469952, at *6 (S.D. Fla. Sept. 20, 2016), *report and recommendation adopted*, No. 13-80685-CIV, 2016 WL 7443342 (S.D. Fla. Oct. 13, 2016). The fact that Dr. Zelby came to Cottrell's attention because he had previously been retained by a non-party for another case is irrelevant. Thus, Cottrell may only recover the $40 witness fee provided in 28 U.S.C. § 1821(b). The Court sustains Poulter's objection and denies Cottrell $1,560 of its requested fees. Therefore, the Court awards Cottrell $12,392.73 in costs pursuant to Fed. R. Civ. P. 54(d).

\*   \*   \*

For the reasons set forth above, the Court's evidentiary rulings were not erroneous and regardless did not prejudice Mr. Poulter because they would not have significantly affected the

jury's verdict. The motion for a new trial is therefore denied. Cottrell is the prevailing party and awarded $12,392.73 in costs as discussed above.

Dated: June 6, 2017

John J. Tharp, Jr.
United States District Judge